**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KEVIN BRADLEY GUMBS, | : |
| Plaintiff, | : Civil Action No. 10-1520 (MLC) |
| v. | : **O P I N I O N** |
| DETECTIVE JOHN O'CONNOR, et al., | : |
| Defendants. | : |

**COOPER, District Judge**

Plaintiff, Kevin Bradley Gumbs, brought this action concerning the constitutionality of a search conducted at his residence, as well as his subsequent arrest and prosecution. Certain claims asserted in the Complaint have already been dismissed. (See dkt. entry no. 21, 4-4-11 Order; dkt. entry no. 20, 4-4-11 Op.) Plaintiff then filed an Amended Complaint (dkt. entry no. 24), which was dismissed. (Dkt. entry no. 27).

Plaintiff later filed a Second Amended Complaint. (Dkt. entry no. 61.) This was permitted pursuant to an Opinion and Order granting in part and denying in part his motion to amend his claims; the only remaining claims are Fourth Amendment challenges to the search of his residence conducted on the evening of May 2-3, 2008, which resulted in the confiscation of a small safe containing cash and jewelry, asserted against the Defendants John O'Connor, James Lopez, and G. Rivera. (Dkt. entry no. 59.) Now pending before the Court is a motion for

summary judgment on behalf of all remaining defendants.  (Dkt. entry no. 41; see dkt. entry no. 60.)[1]

## I.    BACKGROUND

Defendants assert in support of the motion the following undisputed facts.  The Monmouth County Narcotic Strike Force had an active investigation at 191 Forest Avenue, Plaintiff's residence, beginning January 17, 2008, based upon reports of illegal drug activity.  On May 2, 2008, at approximately 5:40 p.m., Lopez and O'Connor went by 191 Forest Avenue and observed Plaintiff standing in the doorway of a vehicle being driven by a white male.  After the officers' observations, they began surveillance of the residence.

Lopez and O'Connor observed both men depart the driveway and enter the residence.  When the driver left the residence, Lopez and O'Connor followed the car he was driving.  On leaving the residence, the driver almost collided with another vehicle.  When the driver made a left turn at an intersection without signaling, the officers made a motor vehicle stop.  The driver was trembling and his speech was impaired.  When he exited the vehicle, he moved

---

[1] The Court previously found that the Fourth Amendment claims proposed to be asserted in the Second Amended Complaint were identical to those already asserted against Defendant John O'Connor, but that the proposed amendment would merely identify the fictitious defendants who also participated in the search of Plaintiff's residence and the seizure of the small safe.  (Dkt. entry no. 59.)  In light of the pending motion for summary judgment, the newly-named defendants James Lopez and G. Rivera have joined in the pending motion for summary judgment.

his tongue in a manner leading the officers to believe he was attempting to hide evidence.  Eventually, the driver spit out a small plastic wrapper containing a white rock-like substance, suspected of being cocaine, and several blue tablets, suspected of being Roxicodone.  During questioning, the driver stated that he had picked up the drugs for a friend.  He further stated that he and Plaintiff went into 191 Forest Avenue, went upstairs, where Plaintiff bagged some "hard" and "blues," and payment was exchanged.  The driver stated that he had purchased drugs from Plaintiff several times.  The driver was shown a photograph of Plaintiff, whom he identified as the person who sold him the drugs in his possession that day, and who was known as "Kevin."  O'Connor and Lopez remained with the driver while he communicated with two persons who sought to buy drugs from him, resulting in the arrests of several people.

Lopez contacted Assistant Prosecutor James Jones the same day and advised him about the status of the investigation.  Jones concluded that there was probable cause to seek a criminal complaint and arrest warrant.  O'Connor on the same day then prepared several criminal complaints and warrants for Plaintiff's arrest, most of which were issued on May 6, 2008; the date on one is not entirely legible, but it appears that it could be May 2, 2008.  (Motion, Ex. H.)

It is undisputed that, at approximately 11:30 p.m. the same day (May 2, 2008), O'Connor, Lopez, and Rivera returned to 191

3

Forest Avenue to arrest Plaintiff. It is undisputed that the officers had not sought and did not possess any search warrant for the premises. As noted above, it is not clear whether the officers possessed an arrest warrant. Patricia Rahner met the officers at the door and advised that Plaintiff was not at home.

The parties are not in agreement as to the events that then transpired. Defendants contend that Rahner, subsequently identified by Plaintiff as a co-owner (presumably with himself) of the home, gave consent for the officers to search for Plaintiff inside the home. It is not clear whether Defendants contend that Rahner gave the consent orally or signed a Consent to Search form. Although Plaintiff was not found inside the home, officers did locate a small safe under a bed and advised Rahner that they had information that controlled dangerous substances were in the room. The officers state that Rahner reported that the safe belonged to her, but that Plaintiff "possibly" stored things in it. The officers state that Rahner consented to a search of the safe but stated that she did not know where the key was. The officers state that Rahner signed a "Consent to Search" form and was advised that a K-9 sniff would be done to determine if there were drugs inside. The "Consent to Search" form states:

> I, __Patricia Rahner__, having been informed of my constitutional rights; first, that I may require that a search warrant be obtained prior to any search being made; second, that I may refuse to consent to any search; third, that anything which may be found as a result of this search which is subject to seizure can

> and will be seized and used against me in a criminal prosecution; fourth, that I may revoke my consent to search at any time; and fifth, that I may consult with anyone of my choosing before I make a decision to waive my rights. By consenting to this search I hereby authorize
>
>  Ptl. Jason Lopez  and  Det. O'Connor  (members of the Keansburg Police Department), to conduct a complete search of the
>
>  X  premises or     vehicle under my control described as
>
> 191 Forest Ave.    safe that was located under the bed
>
> This written permission is given by me voluntarily and without threats or promises of any kind being made to me.
>
>  X  I hereby expressly waive my right to be physically present during the execution of this search.
>
>  P Rahner           May 2, 08 
> Signature             Date

(Motion, Ex. D.)  The consent form is dated, but the time of the consent is not noted.  Thus, the Consent to Search form is ambiguous as to whether it referred to the initial search of the premises or only to the search of the safe.

    The officers state that a K-9 unit was called to the residence and reacted positively, Rahner found a key to the safe, it was opened and contained $335.17 in cash and some jewelry, and the safe and its contents were removed from the home.  Defendants report that the safe and jewelry were returned to Rahner on May 28, 2008.  The cash apparently has not been returned.

    In opposition to the motion, Plaintiff has supplied Rahner's affidavit stating:

On the Evening of May 2nd 2008, around 11pm, and all true to the best of my knowledge.

1    Keansburg Detectives John O'Conner [sic] and Detective Jason Lopez came to my home, at the above address in the evening; I distinctly recall them because they identified themselves. Other officers in the group were familiar to me. ... [A]ll of us have been respectable working class productive citizens of the town.

- They came to the front door
- I was informed they were looking for Kevin Gumbs
- I told them he was not at home
- I was told they had a warrant for his arrest.
- I asked to see the warrant and the detective held up papers, further than an arms reach from me. I asked to handle the papers from his hand in order to be able to read. I was told, "No. Kevin can let you read them after we have arrested him, we don't have to."

2    Our conversation continued at my front door (in my night clothes) for at least 10 minutes, very difficult to obtain information from the officers. Verbally they were very forceful. I was informed having the warrant for his arrest allows them entrance into the house to "Look Around". I inquired if a search warrant was needed? Having wanted to co-operate but at the same time felt need to protect the rights and privacy of my family from this unfamiliar invasion and intrusion. I did not feel the situation was safe. Felt volatile, hostile, and explosive. Everything was very confusing.

They repeatedly pressed for access. Eventually I allowed them entrance understanding they were only looking for Kevin and would not be searching my home. My daughter accompanied Detective O'Connor and Detective Lopez upstairs; I remained downstairs.

Once in my home there were comments made and I was questioned:

- "Just tell us where he keeps the drugs!"
- Do you know he is selling drugs out of the home?

> - So this is what drug money does, as they glanced around my home.
> - You know he sells crack to kids!
>
> I called Kevin on his cell phone and Detective O'Conner [sic] spoke to Kevin. After their conversation it seemed like they were never leaving.
>
> Outside my home, the entire situation was causing a scene. The patrol car had their lights flashing. The officers were armed and vested. Surrounding neighbors were frightened.
>
> The rest of the premises were search[ed] for Kevin, including the garage. At which time the officer notice a gate connecting the back yards between my fathers' home and mine.
>
> This was referred to as an escape route. An officer implying this was a plan imposed and guarded by the entire family. The tone and inflection of everybody voice was demeaning. (The additional gate on my fathers end has been in place since some time in the 60s, and the gate on the Forest Ave side was installed in 1998 when we acquired the house)
>
> Officers came down from being upstairs with a safe. They said I should open it. It didn't belong to me, and I didn't know the combination or have a key. I was questioned what was in the safe, and who did it belong to. They said they had enough reason to believe the safe contained drugs. By not opening it for them I was not co-operating and covering for Kevin. They took the safe out of the house, and called for a K-9 unit.
>
> My daughter Patricia eventually called an attorney, who asked to speak to the detectives, they refused. And made their way out of the home at that time.
>
> Patricia E Rahner [signed]

(Dkt. entry no. 52, Opposition, Ex. A.)

Plaintiff was arrested on May 6, 2008; the charges against him were eventually dropped.

7

## II. SUMMARY JUDGMENT

### A. Federal Rule of Civil Procedure 56

A district court grants summary judgment, as to any claim or defense, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A party asserting that a fact cannot be, or is genuinely disputed, must support the assertion by citing to particular parts of materials in the record, or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1). Nevertheless, the court may consider other materials in the record. Fed.R.Civ.P. 56(c)(3).

Furthermore:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
(1) give an opportunity to properly support or address the fact;
(2) consider the fact undisputed for purposes of the motion;
(3) grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it; or
(4) issue any other appropriate order.

Fed.R.Civ.P. 56(e).

No genuinely triable issue of material fact exists when the movant demonstrates – based on the submitted evidence, and

viewing the facts in the light most favorable to the non-movant – that no rational jury could find in the non-movant's favor. Ambruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994). Thus, the threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In deciding whether triable issues of material fact exist, a court must view the underlying facts and draw all reasonable inferences in favor of the non-movant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

    The movant bears the burden of showing no genuine issue of material fact, and the non-movant opposes the motion by presenting affirmative evidence to the contrary. Anderson, 477 U.S. at 256-57. Once the movant has properly supported a showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted); see Anderson, 477 U.S. at 247-48 ("By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

What the non-movant must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990) ("object of [former Rule 56(e), now Rule 56(c)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"); Anderson, 477 U.S. at 249; see also Big Apple BMW v. BMW of N. Am., 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact, ... the opponent need not match, item for item, each piece of evidence proffered by the movant," but must "exceed[] the 'mere scintilla' threshold and ... offer[] a genuine issue of material fact.").

A movant need not affirmatively disprove the other party's case; the movant may move on the ground that the non-movant lacks evidence "sufficient to establish the existence of an element essential to that party's case." Celotex, 477 U.S. at 322-23. But the movant bears the burden of demonstrating the lack of evidence in the record to support the non-movant's claims. See, e.g., Haywood v. Nye, 999 F.Supp. 1451, 1463 (D. Utah 1998); Andrews v. Crump, 984 F.Supp. 393, 402-03 (W.D.N.C. 1996).

**B.    New Jersey Local Civil Rule 56.1**

New Jersey Local Civil Rule 56.1(a) requires that on summary judgment motions, both the movant and the non-movant furnish a

10

statement identifying what each side deems to be the material facts, so that the Court can determine if a genuine dispute exists. The commentary notes that "[t]he Rule 56.1 statement is viewed by the Court as a vital procedural step, since it constitutes and is relied upon as a critical admission of the parties." The commentary specifies the content and format of the statement: e.g., the assertions must be set out in separately numbered paragraphs; each fact must be supported by a citation to an affidavit.

### III. DISCUSSION

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs where there is some meaningful interference with an individual's possessory interests in that property." U.S. v. Jacobsen, 466 U.S. 109, 113 (1984) (footnote and citation omitted). "[V]alid warrants to search property may be issued when it is satisfactorily demonstrated to the magistrate that fruits, instrumentalities, or evidence of crime is located on the premises," even if "the owner or possessor of the place to be searched is not then reasonably suspected of criminal involvement." Zurcher v. Stanford Daily, 436 U.S. 547, 559-60 (1978). "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v.

11

Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  Those exceptions include search incident to arrest, search made in "hot pursuit," and search pursuant to consent.  Katz, 389 U.S. at 357-58.

For a search to be constitutional based on consent, the consent must have been "voluntarily given, and not the result of duress or coercion, express or implied."  Bustamonte, 412 U.S. at 248.  "Voluntariness is a question of fact to be determined from all the circumstances," Bustamonte, 412 U.S. at 248-49, and resolution of that question must take account of "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."  412 U.S. at 229.

Among the factors relevant to a determination of voluntariness is the extent to which police suggest that they can obtain a warrant if consent is not given.

> When evidence exists to show ... -- that a defendant believed he must consent -- such evidence weighs heavily against a finding that consent was voluntarily given.  And when that belief stems directly from misrepresentations by government agents, however innocently made, we deem the consent even more questionable.
>
> [United States v. Molt, 589 F.2d 1247, 1251-52 (3d Cir. 1978).]
>
> The question of voluntariness often turns on the language the police use in indicating that they will seek a warrant if they do not get the defendant's consent.  When the police state that they will seek to obtain a warrant if consent is not given, there is generally no coercion absent other factors.  However, when the police give the impression that the obtainment of the warrant will be automatic, there is a strong

12

> presumption of coercion. In a case involving a similar situation, our court of appeals stated:
>
>> To the extent that some versions of [the police's] statement suggest that acquiring the warrant would be a foregone conclusion, [the police] might have conveyed to [the defendants] the impression that they had no choice but to consent. On the other hand, if the district court found that [the police officer] clearly indicated to [the defendant] that absent consent, he would only <u>seek</u> to obtain a warrant, and that a magistrate would first have to determine that probable cause existed, such a finding would not militate at all against a finding of voluntary consent.
>
> <u>United States v. Sebetich</u>, 776 F.2d 412, 425 (3d Cir. 1985), <u>reh'g denied</u>, 828 F.2d 1020 (1987), and <u>cert. denied</u>, 484 U.S. 1017 (1988) (emphasis in original).

<u>United States v. Flores</u>, 1991 WL 171394, *10-11 (E.D. Pa. Aug. 29, 1991) (citations omitted), <u>aff'd</u>, 970 F.2d 900 (3d Cir. 1991) (Table).

The person giving consent to the search also must have the authority to do so. <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974). Thus, consent may be given by a third party "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." <u>Id.</u>

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

<u>Id.</u> at 171, n.7 (citations omitted). <u>Cf., e.g.</u>, <u>Frazier v. Cupp</u>, 394 U.S. 731, 740 (1966) (by allowing cousin use of a duffel bag,

13

and leaving it in cousin's home, cousin possessed authority to consent to its search notwithstanding owner's allegation that cousin had permission to use only one compartment within the bag); Stoner v. California, 376 U.S. 483, 488-90 (1964) (search of hotel room cannot rest upon consent of hotel proprietor in absence of indication that proprietor has been authorized by occupant to permit police to search occupant's room); United States v. Kelly, 529 F.2d 1365 (8th Cir. 1976) (consent given by common carrier does not satisfy Fourth Amendment).

    The movants here are not entirely clear, as to the initial search of the premises, whether they are relying upon oral consent or the consent form. Certainly, the consent form is ambiguous. There is also substantial evidence to contradict the contention that Rahner's consent, whether oral or written, was voluntary. It is undisputed that officers came to Rahner's door late at night. In her affidavit, Rahner states that police questioned her at her door, while she was in her nightclothes, for several minutes, while their lights were creating a disturbance in the neighborhood, while brandishing a purported arrest warrant that they told her gave them authority to search her premises, while refusing to permit her to read the alleged warrant. Further, there is evidence that Rahner understood that police would search only for Plaintiff, not for any other purpose. It is not clear that Rahner understood that she had a

14

right to refuse consent to enter.  There is also evidence that Rahner told police that the safe was not hers; in addition, the safe was found under a bed, locked, so it is not clear that she had any authority to consent to a search of the safe, even if she was a co-owner of the premises.  Finally, there is evidence that the police left as soon as Rahner contacted an attorney, raising an inference that police knew their conduct was not proper.  Thus, there is a material dispute of fact regarding whether the Defendants properly obtained consent for the searches of the premises and of the safe they conducted that precludes the grant of summary judgment.

Defendants have argued, in the alternative, that they are entitled to summary judgment on grounds of "qualified immunity."

> Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.  We recently reaffirmed that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first.

Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011) (citations omitted).

As described above, the law regarding voluntary consent to search, including consent by a third party, has been established for many years.  Considering the evidence in the light most favorable to Plaintiff, as this Court must, Defendants have not established an entitlement to qualified immunity.

## IV. CONCLUSION

The motion for summary judgment will be denied.  The Court will issue an appropriate order.


                                             <u>  s/ Mary L. Cooper        </u>
                                             **MARY L. COOPER**
                                             United States District Judge

Dated:  June 12, 2012

16