NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEVIN GUMBS, | CIVIL ACTION NO. 10-1520 (MLC) |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. | |
| DETECTIVE JOHN O'CONNOR, et al., | |
| Defendants. | |

**COOPER, District Judge**

Plaintiff, Kevin Gumbs ("plaintiff"), proceeding pro se, commenced this action against, among others, defendants Detective John O'Connor ("O'Connor"), Officer James Lopez ("Lopez"), and Officer Guillermo Rivera ("Rivera"), all of the Keansburg Police Department, alleging, inter alia: (1) under 42 U.S.C. § ("Section") 1983 that those defendants violated his Fourth Amendment rights; and (2) various state law causes of action. (See docket entry no. ("dkt.") 61, Second Am. Compl.)  Defendants O'Connor, Lopez, and Rivera (collectively "defendants") moved for summary judgment in their favor and against plaintiff pursuant to Federal Rule of Civil Procedure ("Rule") 56 as to the federal claims asserted against them. (See dkt. 154, Defs. Third Mot. for Summ. J.; dkt. 154-1, Defs. Br.)  Plaintiff opposes defendants' motion; however, plaintiff did not file a formal opposition, but instead, filed a cross motion for summary judgment urging the Court's denial of defendants' aforementioned motion. (See dkt. 156, Pl.'s Second Mot. for Summ. J.; dkt. 156-1 Pl.'s Br. in

Opp'n to Summ. J.)  For the reasons that follow, defendants' motion will be granted and plaintiff's motion will be denied as moot.

## I. PROCEDURAL NOTES

Plaintiff filed the initial complaint on March 22, 2010, alleging a variety of federal and state law claims against named defendants, O'Connor, Chief of the Keansburg Police Department James Pigott ("Pigott"), and various John Does in the Keansburg Police Department.[1]  The Court, on April 4, 2011, entered an Order dismissing all claims, except for plaintiff's Fourth Amendment unlawful search claim against O'Connor.  (See dkt. 21, 4-4-11 Order.)  In the accompanying memorandum opinion, the Court provided to plaintiff the opportunity to amend the complaint to allege claims for false arrest and false imprisonment.  (See id.)  Numerous amendments and attempted amendments by plaintiff occurred over the lifetime of the present case; the Court will lay out the history below.

Plaintiff filed an amended complaint in April 2011 attempting to state claims of false arrest and false imprisonment.  (See dkt. 24, Am. Compl.)  The Court dismissed that amended complaint without prejudice as "the Amended Complaint appear[ed] to simply re-state the claims that were dismissed by the Court in the April Order."  (See dkt. 27, 5-10-11 Order.)  Again, the Court instructed plaintiff that if he wished to file a second amended complaint, "he may do so only by: (1) moving before the Magistrate Judge – upon a proper notice of motion and in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules – for

---

[1] Pigott was only mentioned in the lawsuit by way of his status as the party to be named in lawsuits against Keansburg Police Department.  Once the John Does were identified as Lopez and Rivera, Pigott was dropped from the case.

2

leave to file a second amended complaint, and (2) annexing a proposed second amended complaint as an exhibit thereto." (See id.)

Plaintiff filed a motion requesting the right to file a second amended complaint on November 16, 2011, seeking to name additional defendants and reassert claims of false arrest and false imprisonment. (See dkt. 49, Mot. to Am. Compl.) The Court granted plaintiff's request to file a revised second amended complaint, but denied his request to add additional causes of action. (See dkt. 59, 1-12-12 Order.) The Court mandated that the scope of the amended complaint be limited to unreasonable search in violation of plaintiff's Fourth Amendment rights against defendants in their official and individual capacities, and that Lopez and Rivera were the only two additional individuals the amended complaint could name as defendants. (Id.)

Plaintiff filed a revised amended complaint in January 2012, asserting a cause of action for illegal search and seizure in violation of the Fourth and Fourteenth Amendments against defendants O'Connor, Lopez, Rivera, and Pigott. (See dkt. 61, Second Am. Compl.) Additionally, plaintiff alleged claims for malicious prosecution, false arrest, loss of property, and false imprisonment—claims against O'Connor which the Court dismissed on April 4, 2011. (See id.; dkt. 21.)

Defendants, prior to 2012, moved for summary judgment on October 6, 2011. (See dkt. 41, 10-2011 Mot.) The Court denied that motion on June 12, 2012, and ordered defendants O'Connor, Lopez, and Rivera to answer the second amended complaint, which defendants then answered on June 26, 2012. (See dkt. 66, 6-2012 Order; dkt. 68, Defs. Am. Answer.)

Plaintiff moved again, on October 12, 2012, to amend his claims for a third time to include claims for false arrest and false imprisonment against defendants O'Connor, Lopez, and Rivera. (See dkt. 82, Pl.'s Application to Am.) Based on the Court's dismissal without prejudice as to those claims in April 2011 and plaintiff's failure to rectify the deficiencies in the claims, the Court denied plaintiff's request to file a third amended complaint in January 2013. (See dkt. 92, 1-31-13 Order.)

Defendants moved again for summary judgment on April 4, 2013. (See dkt. 103, Defs. Second Mot. for Summ. J.) Plaintiff opposed that motion and then cross-moved for summary judgment as well as for permission to amend the claims again to assert an entirely new cause of action. (See dkt. 110, Pl.'s Mot. for Summ. J.) The Court denied both motions on June 14, 2013. (See dkt. 114, 6-2013 Mem. Op.; dkt. 115, 6-2013 Order.) Specifically, the Court denied defendants' motion based on the existence of outstanding factual disputes. (See dkt. 114.)

Defendants filed a motion on March 10, 2014, seeking dismissal of the current claims upon their alleged proof that the outstanding factual dispute was no longer at issue. (See dkt. 141, Defs. Mot. in Limine.) The Court, on October 30, 2014, entered an order denying that motion, but granting leave to defendants to move for summary judgment pursuant to Rule 56. (See dkt. 152, 10-2014 Order.) Defendants have now so moved, and the Court now considers that motion for summary judgment. (See dkt. 154; dkt. 154-1.)

Plaintiff then cross-moved on January 8, 2015—without leave from the Court and instead of filing an opposition to the defendants' motion as instructed—for summary

4

judgment.  (See dkt. 156; dkt. 156-1.)  The Court will resolve that cross motion in this memorandum opinion as well.

## II.   BACKGROUND

### A.   Plaintiff's Version of Events[2]

Plaintiff contends that on May 2, 2008, members of the Keansburg Police Department entered into his home in Keansburg, New Jersey and undertook a search of his property, based on a nonexistent arrest warrant, in violation of his Fourth Amendment rights.  (See dkt. 61 at ¶ 1.)  The Court will detail the specifics of plaintiff's allegations.

On May 2, 2008 at around 11:30PM, defendants arrived at plaintiff's residence, located at 191 Forest Avenue, Keansburg, New Jersey.  (See id.; dkt. 156-2, Pl.'s Exs., Ex. B at 11.)  Plaintiff's girlfriend's mother and co-tenant of the property answered the door.  (See dkt. 61 at ¶ 2.)  Plaintiff alleges that defendants "became verbally aggressive towards [his girlfriend's mother] pressuring her to gain entrance into the residence."  (See dkt. 167 at ¶ 28.) Defendants explained that they had a warrant for plaintiff's arrest and the mother allowed

---

[2] The papers filed by plaintiff on these pending summary judgment motions consist of the following: a complaint, an amended complaint, a second amended complaint, an amended statement of material facts, two motions for summary judgment and accompanying briefs, an opposition to defendants' third motion for summary judgment, and various exhibits.  (See generally dkt. 1; dkt. 24; dkt. 61; dkt. 110; dkt. 156; dkt. 167.)  As this listing shows, some of the material submitted by plaintiff includes certain exhibits originally filed by defendants in their motion papers.  The asserted facts and citations in this subsection of this opinion are all based on plaintiff's submissions.  The Court notes that plaintiff did not file any sworn affidavit or verified declaration of his own, so some of the alleged facts set forth in his pleadings (complaint and subsequent amended complaints) and summary judgment briefs are not supported in evidentiary form.  See Fed.R.Civ.P. 56(c).  Recognizing plaintiff's pro se status, the Court will deem that as to any assertions in his pleadings and briefs that purport to be based on his own personal knowledge, he would so testify at trial.  However, any unsupported assertions not based on plaintiff's personal knowledge (such as inadmissible hearsay) will be deemed to be unsupported in the record.

defendants into the home to "look around" for plaintiff. (See dkt. 61 at ¶¶ 2–3.) The officers examined the downstairs rooms for plaintiff, and then proceeded upstairs, escorted by plaintiff's girlfriend Patricia Rahner ("Rahner"), in an attempt to locate plaintiff. (Id. at ¶ 4.)

Defendants, while upstairs in the bedroom shared by plaintiff and Rahner, searched under the bed for plaintiff and discovered a lock box safe under the bed. (Id.; see also dkt. 156-2, Ex. B at 11–12.) Rahner explained to defendants that the safe belonged to her, but that plaintiff may have stored items in it. (See dkt. 156-2, Ex. B at 11–12.) Defendants asked Rahner to sign a consent-to-search form "to allow them to search the locked safe and she did." (See dkt. 61 at ¶ 5; see also dkt. 167, Pl.'s Am. Statement of Facts at ¶ 29.) Defendants, according to plaintiff, removed the safe from the house and had the K-9 unit inspect the safe outside the home. (See dkt. 61 at ¶ 6; dkt. 156-2, Ex. B at 12.) After the examination by the K-9 unit, Rahner provided defendant Lopez with a key to the safe. (See dkt. 61 at ¶ 7; dkt. 156-2, Ex. B at 12.) Defendants opened the safe and found "a large bundle of cash in denominations of 1's, 5's, and 10's which is indictive (sic) to profits of selling narcotics" and jewelry; however, a "positive [K-9 unit dog] sniff was indicated on the safe for [controlled dangerous substances]." (See dkt. 156-2, Ex. B at 12; dkt. 61 at ¶ 7.) Plaintiff states that defendants then seized the safe and its contents. (See dkt. 61 at ¶ 8.) In all, plaintiff alleges that defendants searched 191 Forest Avenue for approximately an hour and a half. (See dkt. 61 at ¶ 4.) Three days later on May 6, 2008, plaintiff was arrested by the Keansburg Police Department. (See dkt. 167 at ¶ 18.)

## B.     Key Background Information

Plaintiff's version of events leaves out key background information about why defendants arrived at his home on the evening of May 2, 2008.  Plaintiff, on the whole, does not challenge these facts so the Court will review that information for completeness and context.

O'Connor certifies that on the evening of May 2, 2008, he and Lopez "observed a vehicle parked in the driveway of 191 Forest Avenue, with the passenger door ajar and a black male (later identified as Kevin Gumbs [plaintiff]) standing in the doorway;" "[a] white male (later identified as John Tufaro) was sitting in the driver's seat." (See dkt. 161-1 at 52–53.)[3]  O'Connor and Lopez observed plaintiff and Tufaro enter the residence, with Tufaro leaving by himself in his vehicle "five minutes" later. (Id. at 53.)  Shortly after leaving, Tufaro "made a left turn without signaling" at an intersection. (Id.)  At this time, O'Connor and Lopez "made a motor vehicle stop of Tufaro's vehicle in front of the driveway to Keansburg High School." (Id.)  O'Connor certifies that:

> I observed Tufaro's hands to be trembling and his speech impaired.  I requested Tufaro to exit his vehicle.  As Tufaro began to walk past me I noticed him using his tongue in a manner which led me to believe he was attempting to secrete evidence.  I advised [Lopez] who asked Tufaro to open his mouth.  When Tufaro refused, [Lopez] placed him in a compliance hold.  Tufaro opened his mouth for a short moment and I

---

[3] Defendants allege that they were monitoring 191 Forest Avenue as part of an investigation into controlled dangerous substances ("CDS") related activity at the residence.  (See 161-1, Ex. G at 52.)  Plaintiff challenges that an investigation was indeed taking place, stating "there are no record (sic) or documentation confirming defendants' allegations of having an active Monmouth County Narcotic Strike Force investigation at 191 Forest Avenue." (See dkt. 56, Am. Statement Disputing Defs. Material Facts at 1.)  Given that this recounting of the case views the facts in the light most favorable to the nonmovant, plaintiff, the Court will discount that there was a CDS investigation occurring on May 2, 2008 when analyzing defendants' motion for summary judgment later in this memorandum opinion.

> observed plastic wrapping indicative of CDS . . . . [Tufaro] spit out a
> small plastic wrapping, which contained a white rock like substance
> suspected to be cocaine and several blue tablets, suspected to be
> Roxicodone. [Lopez] secured the evidence and Tufaro was read his
> Miranda rights, which he waived.

(Id. at 53–54.)

O'Connor and Lopez transported Tufaro back to Keansburg Police Department and brought him into an interview room as Tufaro stated that he wanted to speak with the officers. O'Connor certifies that Tufaro "admitted going into 191 Forest Avenue and buying 'hard and blues' from [plaintiff] for $100.00." (Id. at 55.) Tufaro "also identified [plaintiff] in a photograph as being the person mentioned in the interview who sold him the drugs." (Id.)

O'Connor then certifies that upon the completion of his interview with Tufaro, he typed up a warrant for plaintiff's arrest and brought "the warrant to the Court administrator [who determined that] probable cause was found for the issuance of [plaintiff's] arrest [warrant]." (Id. at 56.)[4] "After having the criminal [C]omplaint[-Warrant] signed by the Court," O'Connor "attempted warrant service . . . upon [plaintiff] at the address listed on the warrant – Complaint No. W 2008 000345 – at 191 Forest Avenue." (Id.) O'Connor states that when he arrived at 191 Forest Avenue around 11:30PM on May 2, 2008 with Lopez, the "arrest warrant was signed by the Court prior to this time" and that he "had a copy of the

---

[4] According to the New Jersey Rules of Court, a municipal court administrator is statutorily authorized to issue a Complaint-Warrant. N.J.Ct.R. 3:3-1. The New Jersey Complaint-Warrant is a one-page standardized form, featuring several required sections, including: identifying information for both the complainant and the defendant, facts stated, a sworn certification of the facts stated by the complainant, the charges to be filed against defendant, and a probable cause determination and issuance of warrant by the appropriate judicial officer. (See dkt. 154-3, Ex. C.) Here, a court officer found there to be probable cause for plaintiff's arrest according to the May 2, 2008 Complaint-Warrant. (See id.) Additionally, plaintiff has admitted that on that date, "probable cause was found to issue an arrest warrant against Plaintiff for CDS related crimes." (See dkt. 167 at 10–11.)

arrest warrant with [him] when [he] arrived at 191 Forest Avenue that evening." (Id.) O'Connor stated, however, that it is "not his practice to turn over a copy of the [arrest] warrant when executing it, especially to persons who are not the subject of the [arrest] warrant or in narcotics cases due to the risk of destruction of evidence." (Id.)

Plaintiff contends that an arrest warrant did not in fact exist on May 2, 2008 when defendants arrived at his residence. (See dkt. 56 at 11.) This belief is primarily based on the fact that a copy of the warrant was not shown to either Rahner or her mother. (See dkt. 56 at 11.)[5] The Court will now turn to defendants' motion for summary judgment.

### III. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56, which provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 331 (1986). In response, "the nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a

---

[5] Rahner states that when she asked to see a copy of the arrest warrant, defendants held up a piece of paper and then lowered it: "I got a sheet of paper held up arm's length away from me . . . . But then the paper went down again." (See dkt. 161-1, Ex. C, Rahner Dep. at 18.)

9

verdict for the non-moving party." Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) and Celotex Corp., 477 U.S. at 322–23). Summary judgment is "proper if, viewing the record in the light most favorable to the non-moving party and drawing all inferences in that party's favor, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009).

## IV. LEGAL PRINCIPLES AND DISCUSSION

Plaintiff alleges, under Section 1983, that defendants violated his rights as set out under the Fourth Amendment of the United States Constitution. (See dkt. 61 at 2.)

### A. Federal Claims Under 42 U.S.C. § 1983

Section 1983 does not provide substantive rights. Baker v. McCullan, 443 U.S. 137, 144–45 (1979). Instead, it is a vehicle for individuals to vindicate the deprivation of their federal rights by state action. Id.

Two initial elements must be established by a plaintiff seeking to prevail on a Section 1983 claim: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Parratt v. Taylor, 451 U.S. 527, 535 (1981). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Adkins, 487 U.S. 42, 49 (1988) (citing United States v. Classic, 313 U.S. 299,

326 (1941)). Further, "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Id.

### 1. Fourth Amendment

The Fourth Amendment provides:

> [t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Am. IV. In order to state an illegal seizure claim under the Fourth Amendment, a plaintiff must first establish that he was "seized," requiring a demonstration of an "intentional acquisition of physical control." Brower v. Cnty. of Inyo, 489 U.S. 593, 597 (1989); see Graham v. O'Connor, 490 U.S. 386, 394 (1989); Tennessee v. Garner, 471 U.S. 1, 7–8 (1985). When government actors have, "by means of physical force or show of authority . . . in some way restrained the liberty of a citizen," they have seized that person for purposes of the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).

Searches "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). In the absence of consent or exigent circumstances as defined by the United States Supreme Court, police must seek a search warrant prior to conducting a search of a person or property. See id.

### a. The Arrest Warrant

Plaintiff alleges that the events of May 2, 2008—the search of his residence for his person without an arrest warrant—involving defendants violated his Fourth Amendment rights. (See dkt. 1.) While plaintiff asserts that defendants did not have an arrest warrant on the night of May 2, 2008, plaintiff produces no evidence to support his claim. On the contrary, his best source of information, Rahner, who was one of the individuals that defendants spoke to, claims that the officers showed her a piece of paper, but took it back from her reach. (See dkt. 161-1, Ex. C at 18.) Moreover, plaintiff cites no authority, and the Court is aware of none, requiring officers to display an arrest warrant (as distinguished from a search warrant) to anyone while executing the arrest warrant.[6]

Defendants, in response, produced an actual copy of the criminal Complaint-Warrant signed by the court officer, Celeste Zeiser ("Zeiser") on May 2, 2008. (See dkt. 154-3, Ex. C.)[7] Additionally, Zeiser has certified to the Court that she did in fact issue a criminal

---

[6] To the extent that plaintiff attempts to argue that the sworn facts stated on the W 2008 000345 form are an improper basis for a determination of probable cause due to their origination with Tufaro and not O'Connor himself, plaintiff misstates the facts and the law. Defendants witnessed Tufaro and plaintiff arrive at plaintiff's home and go into plaintiff's residence. (See dkt. 161-1 at 52–53.) They then watched Tufaro leave alone, conducted a valid traffic stop on Tufaro, and found CDS material in Tufaro's mouth, which he later claimed to have been bought from plaintiff. (Id.) Because of defendants' personal involvement, plaintiff cannot make a colorable argument that defendants did not have personal knowledge of the sworn allegations contained in W 2008 000345. Additionally, it is settled law that a sworn complaint setting forth probable cause for an arrest warrant may utilize hearsay information. rather than personal information of the affiant, so long as the affiant can corroborate the hearsay information through other means. See Draper v. United States, 358 U.S. 307, 333 (1959); Jones v. United States, 362 U.S. 257, 269 (1960).

[7] See supra note 4.

Complaint-Warrant for plaintiff's arrest. (See dkt. 161-1, Ex. G at 50–51.)[8] Zeiser states that on May 2, 2008, "O'Connor came to [her] home at 62 Willis Avenue, Keansburg[, New Jersey], between the hours of 6:30PM and 11:30PM, presenting Complaint – Warrant W 2008 000345." (Id. at 50.) While there were additional warrants for plaintiff's arrest signed by Zeiser on May 6, 2008 when plaintiff turned himself into police, she certifies that she signed all copies of Complaint – Warrant W 2008 000345 on May 2, 2008. (Id. at 51; see also dkt. 154-3, Ex. D [attaching copies of three Complaint-Warrants bearing issuance date of May 6, 2008, and numbered 000350, 000351, and 000353].)

O'Connor further writes in his contemporaneous Monmouth County Uniform Crime Report dated May 3, 2008, that:

> On 05/02/2008, . . . . This officer signed various [arrest] warrants against [plaintiff] for various CDS related Crimes. The [Complaint-Warrants] were issued by the court and need to be served. At the time of this report, [plaintiff] has not been served with his [Complaint-Warrant].

(See dkt. 154-3, Ex. A at 5.) Viewing these facts in the light most favorable to plaintiff, the Court determines that no reasonable jury could find that the arrest warrant number W 2008 000345 was not issued on May 2, 2008, before defendants searched plaintiff's home. Thus, the search is deemed constitutional as a proper search incident to executing an arrest warrant.

    **b.**    **Consent**

An individual can waive his or her Fourth Amendment rights, rendering a warrant unnecessary, where that individual consents to a search or seizure. United States v. Matlock,

---

[8] Detective Captain of Police John White and Deputy Chief of Police for Keansburg Police Department Pigott certify the same information to be true. (See dkt. 154-1 at 45–50.)

13

415 U.S. 164, 171 (1974). The Fourth Amendment recognizes that officers may engage in a valid warrantless entry and search of a location when the officers obtain voluntary consent from an occupant who shares, or is reasonably believed to share, common authority over the property and no present co-tenant objects. Georgia v. Randolph, 547 U.S. 103, 109 (2006); see also Beatty v. Twp. of Elk, No. 08-2235, 2010 WL 1493107 (D.N.J. 2010). "A third-party has common authority over property when he or she has mutual use of or a substantial interest in it." United States v. Anderson, 284 Fed.Appx. 977, 979 (3d Cir. 2008). Thus, an individual may have authority to consent from the "mutual use of the property by persons generally having joint access or control for most purposes." Matlock, 415 U.S. at 171.

Even assuming defendants did not possess an arrest warrant on the evening in question, the co-tenants provided defendants with consent to search the premises at 191 Forest Avenue, and Rahner gave both oral and written consent to search the safe on May 2, 2008, thus encompassing the entire search within the consent exception to the warrant requirement and rendering it neither unreasonable nor illegal.

Rahner's mother answered the door when defendants arrived at plaintiff's home, and she explained that she resided at the residence along with plaintiff and Rahner. (See dkt. 161-1, Ex. C at 17.) Despite "badgering" by defendants for around 10 minutes, Rahner's mother allowed defendants to enter the house to "look for [plaintiff]," "do a scan" without "going through [her] things." (See id. at 18, 20, 23.) As she stated, "[c]onsent was given." (See id. at 20.) When defendants searched under the bed for plaintiff, they failed to find plaintiff but

14

instead found a safe. While this could be viewed as more than a "scan," Rahner admitted that physically looking for plaintiff would include looking under a bed. (See id. at 24.)[9]

Defendants found the safe in the bedroom that Rahner and plaintiff shared, stored under the bed that Rahner and plaintiff slept in. (See dkt. 161-1, Ex. G at 40.) When defendants asked if they could search the safe, Rahner replied that she would open it for them, as there was nothing illegal contained inside the safe. (See id. at 41.) In addition to that verbal consent, defendants asked Rahner to sign a consent to search form, which she did as well. (See id.; see also dkt. 161-1, Ex. D.)[10] It was only after Rahner provided two forms of consent that defendants searched the safe. As a result, even in the absence of an arrest or search warrant, Rahner provided valid consent for defendants to search the areas in the home and the safe found within the home.

---

[9] As excerpted from Rahner's deposition, with "A" denoting Rahner's answers to the questioning attorney noted by "Q": "Q: You understand that you have to, in order to look for someone in a house, you got to look in the home; right? A: We went through this, you and I, before too, and with them. They would be looking physically for Kevin, yes. Q: And you would agree that that would include looking under a bed? A: That's – yes." (See dkt. 161-1, Ex. C at 24.)

[10] The text of the consent to search form, signed by Rahner, expressly stated her rights. It read:

> I, Patricia Rahner, having been informed of my constitutional rights; first, that I may require that a search warrant be obtained prior to any search being made; second, that I may refuse to consent to any search; third, that anything which may be found as a result of this search which is subject to seizure can and will be seized and used against me in a criminal prosecution; fourth, that I may revoke my consent to search at any time; and fifth, that I may consult with anyone of my choosing before I make a decision to waive my rights. By consenting to this search, I hereby authorize Ptl. Jason Lopez and Det. O'Connor (members of the Keansburg Police Department), to conduct a complete search of the premises 191 Forest Avenue safe that was located under the bed. This written permission is given by me voluntarily and without threats or promises of any kind being made to me. I hereby expressly waive my right to be physically present during the execution of this search.

(See dkt. 161-1, Ex. D.)

Consent to search must also be found to be voluntary in nature. Bumper v. North Carolina, 391 U.S. 542, 548–49 (1968). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Thus, a court considering voluntariness should examine the consenting individual's age, intelligence, and educational background, and whether there were "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." Id. at 226, 229. While a court should consider whether the consenting individual knew of his or her right to refuse consent for the search, it is not dispositive of, nor required for, valid consent. United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994).

The evidence demonstrates that both Rahner and her mother voluntarily consented to the search of their home for plaintiff. As co-tenants of 191 Forest Avenue, both women had the authority to consent to the search of the house. When defendants arrived and advised the women that they had an arrest warrant for plaintiff, the women eventually allowed the officers into the home so that they could undertake a limited search of the residence for plaintiff. (See dkt. 1 at 7; dkt. 154-4, Ex. J at 38–41.) Even though Rahner's mother initially believed that the officers were being "aggressive in their demeanor," she consented to the search once parameters were set in the search for plaintiff. (Id. at 40–41.) Notably, Rahner's mother knew she could set parameters around such a search, which mitigates any argument by plaintiff that Rahner's mother was coerced into providing consent or did not know her rights. Thus, the statement about aggression forms the entirety of plaintiff's argument that the search was not voluntary. Such a position is untenable. Given the deposition testimony from both

16

Rahner and her mother stating that they did in fact consent to the officers searching the residence under limited conditions, and the signed consent-to-search form provided by Rahner, the Court concludes that the women voluntarily consented to defendants' search. Thus, viewing the facts in the light most favorable to plaintiff, the Court finds that no reasonable jury could find that the officers lacked consent to search the areas and items that they did. Defendants' motion for summary judgment will therefore be granted.

### 2. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). While plaintiff's Section 1983 claims fail to survive summary judgment without turning to qualified immunity analysis, the Court will address the applicability of the defense as it further reinforces the grant of summary judgment.

Defendants' job duties as officers and detectives included conducting surveillance on various properties, enforcing traffic laws, and executing search and arrest warrants. Plaintiff is correct that he has a constitutional right to be free from unreasonable searches and seizures. Despite this right, there is no evidence that any of the defendants had reason to believe that they were impermissibly violating this right by entering plaintiff's home after plaintiff's girlfriend, Rahner—an individual with common authority over the property—provided oral consent, and then by searching the safe found in the bedroom when Rahner again consented—both orally and in writing.

The evidence further supports that defendants entered the home possessing a valid arrest warrant for plaintiff—obtained based on a judicial officer's finding of probable cause for the arrest—prior to arriving at 191 Forest Avenue. This is exactly the type of case where qualified immunity applies to police officers in order to defend against a lawsuit. Thus, plaintiff failed to satisfy the requirements to defeat qualified immunity, and defendants are entitled to the defense.

### B.    Plaintiff's Cross Motion for Summary Judgment

The foregoing conclusion in this memorandum opinion—holding that defendants' motion for summary judgment is granted—renders plaintiff's cross motion for summary judgment moot. It is worth noting, however, that plaintiff did not follow the proper protocol for filing a cross motion for summary judgment. (See dkt. 156.) Once defendants filed their motion for summary judgment on November 25, 2014, plaintiff had the opportunity to respond to that motion by filing an opposition brief. The Court granted leave to defendants to file their motion, noted in the Court's October 31, 2014 Order, but plaintiff was never similarly granted leave to file his cross motion. (See dkt. 152, 10-2014 Order.) Had it not been deemed moot by the Court's holding, plaintiff's cross motion would have been considered improper and accordingly denied. However, the Court has carefully considered the submissions in plaintiff's cross motion in analyzing and ruling upon defendants' motion.

## V. CONCLUSION

For these reasons, defendants' motion for summary judgment will be granted and plaintiff's cross motion for summary judgment will be denied as moot. The Court will issue an appropriate Order and Judgment.

                                                            s/ Mary L. Cooper
                                                           **MARY L. COOPER**
                                                           United States District Judge

Dated: May 8, 2015